Case No. 14-5300 et al. Defenders of Wildlife et al. v. Sally Jewell In her official capacity as Secretary of the United States Department of the Interior et al. State of Wyoming et al. Ms. Pepin v. Appellant Jewell et al. Ms. Jurdy v. Appellant State of Wyoming And Ms. Oppresso v. Appellant Good morning. Good morning. May it please the Court. May it please the Court. My name is Joan Pepin on behalf of the Fish and Wildlife Service. I'll be sharing time with Mr. Jurdy on behalf of the State of Wyoming. At the time of the delisting rule in this case, the minimum wolf population in Wyoming was 328 wolves and 27 breeding pairs. That is roughly triple of the requirement of the recovery plan of 10 breeding pairs and 100 wolves. That Wyoming population is connected to a greater population in the northern Rocky Mountains of over 1,700 wolves, the rest of which has already been delisted. Now, it was not previously delisted in Wyoming because at that time the Fish and Wildlife Service did not believe that Wyoming had adequate regulatory mechanisms to maintain its share of the wolf population. So, they worked together with Wyoming and eventually came to an agreement that will provide that protection not only to get to the minimum standard but to provide a wide safety margin above it. And here's how that plan works. Maybe we might cut to the chase a little bit here. Sure. I want to be clear about the issue on gene flow. Oh. And this study by Von Holt that's on JA 1044, the way I look at that, and I want to be clear that I'm looking at it correctly, is it's talking about Yellowstone, Idaho, and Montana. But it's not talking about Wyoming. Well, Yellow... Right, but my point is that the whole issue here is the Wyoming plan and Wyoming can't take credit for what's going on in Yellowstone. So, my only question here is this Von Holt study. When I look at it, I don't see this discussion of Wyoming other than to the extent Yellowstone... Okay, I think I can answer that. In order to delist the species, Fish and Wildlife Service has defined that it is not endangered or threatened by any of the five listed factors in Section 4A. Can you answer my question? I'm trying to. One of those is an analyzed adequate genetic connectivity under the other factor. And what is required in order to delist is finding that the greater Yellowstone area population is genetically connected to the other populations. That is the recovery plan standard. In the Von Holt study, it looked at the other states and Yellowstone, but it didn't talk about Wyoming. Am I right or wrong as a factual matter? There's very significant overlap. But the recovery plan requirement for genetic connectivity, which is what we have to make sure is satisfied in order to make the agency's finding that it exists proper, is that there be connectivity to the greater Yellowstone area. It doesn't have to be within the Wyoming area. So is the Fish and Wildlife position that if the wolves go from Yellowstone elsewhere, that satisfies any genetic obligations Wyoming may have? The concern in this case has been migration into the greater Yellowstone area rather than out of it. From Wyoming, I thought. No, actually they need to be coming... From where? Mainly from Idaho. They could come from Montana, but as a matter of fact... What's all this chatter about how you get out of Wyoming through the mountains and all to get into the park so you can have this? I thought we were focusing on what's going to happen to the wolves in Wyoming in terms of is there any genetics? The distinction between Yellowstone and the rest of Wyoming applies to the population management. Wyoming must maintain 10 breeding pairs and 100 wolves in those areas under its wildlife jurisdiction. So it's irrelevant, is the question, whether any wolf goes from Wyoming outside the Yellowstone Park area for purposes of genetic connection? If it went from Wyoming into Yellowstone, that would not count as migration. It has to be from another population, Idaho or Montana, in order to bring in that diversity from another subpopulation that the recovery plan calls for. Now you raised the question of the mountains... So we're only talking about migration from Idaho and Montana into Wyoming? That's been the disputed issue, yes. And I should say not into Wyoming, but into the greater Yellowstone area. Not the park, but the greater Yellowstone area. I just want to understand the Wyoming plan is talking about maintaining this minimum, all right? That's the population objective. The genetic objective is separate. I understand. But I thought the whole issue here was, or one of the issues, was whether Montana's plan was adequate to maintain this minimum. And part of that consideration was, was there going to be this genetic connection? But you're telling us, and I'm not suggesting you're not right, but I just want to be clear about this, because I was surprised when I turned to the whole study that everybody's talking about. And it doesn't talk about Wyoming, other than Yellowstone National Park. The recovery plan requires two separate things. It requires a population of at least 10 in 100 in Wyoming. That one is done by the state level. It also requires adequate genetic connectivity between subpopulations. That one is done at the population level. Where are these subpopulations? What state? Well, they all cross state lines. All three of them do. So we are focusing on wolves that are in Wyoming, outside of Yellowstone, as well as inside Yellowstone. Is that correct? All of the wolves in Wyoming, plus quite a lot of wolves near the borders of Wyoming, are part of the greater Yellowstone area subpopulation. You're confusing me, and I'm trying to get clarity here. I look at the Von Holtz study. It's talking about Idaho. It never mentions Wyoming, except in connection with Yellowstone. And I thought the Fish and Wildlife Service was approving the plan that Wyoming has to maintain this minimum that the Fish and Wildlife Service says is necessary. And are you telling me that's totally irrelevant? Because the plan itself says at JA1085, managing wolves, this is a Wyoming plan, managing wolves above the minimum recovery level will enhance the likelihood for genetic connectivity through natural dispersal and immigration. So at least Wyoming thinks that genetic connectivity is relevant. And the way the Fish and Wildlife Service has defined Wyoming's obligation, it excludes Yellowstone and the Indian Reservation. It does not exclude Yellowstone National Park from the genetic connectivity part of the recovery standard. The genetic connectivity part of the recovery standard is managed at the population level. Here's what I don't understand. If that's true, then why does Wyoming have any obligation to do anything with regard to genetic connectivity when the Fish and Wildlife Service acknowledges that the state has no control over what goes on in Yellowstone or the Indian Reservation? Well, two reasons, Your Honor. First of all, because in order for this population to be delisted and revert to state management, it has to be not endangered or threatened. And one of the recovery goals is genetic connectivity between the other populations in Idaho and Montana and the greater Yellowstone area, which is not exclusively in Wyoming, but it's mostly in Wyoming. And now I'm getting to the point that's raised by the plaintiffs, as you undoubtedly realize. When the Fish and Wildlife Service relies on this Von Holtz study and then doubles its expectations in terms of the number of wolves, in terms of whether Wyoming's plan meets the minimum of one effective migrant per generation, all right, one every four years, how can it rely on a study that doesn't even address Wyoming? The migration does not need to be into Wyoming. In order for the plan to be satisfied and the survival of this species to be assured, the migration needs to be into the greater Yellowstone area. That could be in Wyoming, outside Yellowstone. It could be in Yellowstone. It could be in Montana or Idaho, but near Yellowstone. All of that. The Fish and Wildlife Service does not care whether any wolf in Wyoming is able to get into Yellowstone or Idaho or Montana, or whether any wolf from Montana, Idaho, or Yellowstone can get into Wyoming. What we care about is that wolves from Montana and Idaho can get into the greater Yellowstone area, which may or may not mean Wyoming. If they migrate to the western areas, on page 1034, I believe it's 1030, 1036, 1037 of the Joint Appendix is a map of the packs in the area. You can see the shaded area in the northwest corner of Wyoming is Yellowstone National Park, which is where all the wolves of Wyoming initially were when they were introduced here. When hunters want to go to Wyoming to hunt, the only place they're going to find wolves is in Yellowstone National Park? No. Can you see all the packs that are outside Yellowstone National Park? That's my point, Council. Yes. We are looking at the wolves in Wyoming outside of Yellowstone National Park. Absolutely. Any breeding by these wolves with these wolves accomplishes genetic exchange. And so the Fish and Wildlife Service relies on a study in terms of projecting for purposes of genetic connectivity that doesn't deal with these wolves. And what's going on in Montana? Other than in Yellowstone National Park. That survey is not limited to Yellowstone National Park. It discusses the greater Yellowstone area, which is the name for basically this. So on your map on page 1037, I see the state of Wyoming, I see Yellowstone, and I see other sightings of wolves. Now, what do you define as the greater Yellowstone area? And where will I find that in the record? We actually do have a map of that, and I wish I had that number for you right now. It's in the same volume of the appendix a little earlier, and I will have that by rebuttal. But the basic answer to your question, do you see there's sort of a big cluster here, a cluster here, and a gap in between? The part that's down here, that's the greater Yellowstone area. That's not a disputed fact at all. Is it the gray area? It's just where all the black dogs are. The black dogs are wolf packs, and all those wolf packs are in the... So all wolves in Wyoming are in Yellowstone National Park? No. I'm sorry. Yellowstone National Park is the dark shaded area. That's a national park. There's a subpopulation called the greater Yellowstone area, and that is all of these wolves that have migrated out from Yellowstone Park over the last 20 years. Plus the ones that are still in it. And that is the subpopulation into which we need to have at least one migrant per generation, and that is what the Von Holtz study did study, the greater Yellowstone area. That is not disputed, but that's appropriate. That's the recovery plan standard. The plaintiffs have not objected to the use of these population areas rather than state boundaries for managing migration. Well, maybe counsel for the state can help me here, because when I looked at this study, I don't see any reference to anything other than Yellowstone National Park. I don't see this reference to this greater Yellowstone National Park. I would like to point out, though, that the services finding on genetic connectivity did not rely solely on the Von Holtz study. It also relied on the Jimenez study, which tracked radio-collared wolves. And what that study showed is that between 2002 and 2007, there were four radio-collared wolves that entered the greater Yellowstone area, not all of them in the park. I would like to ask you a little bit about this whole question about the buffer zone or safety margin. And just so we don't go down, you know, a frolicking detour, I'm talking about the question whether Wyoming has an obligation to manage for above the 110 threshold, putting aside the greater Yellowstone area where the Fish and Wildlife Service has also said that provides its own kind of buffer. And, indeed, that's how Fish and Wildlife, as I understand it, distinguished between the level of wolf population that Wyoming is managing for, consisting from Idaho and Montana, which are managing for 150 and 50 rather than 110. So there's this dispute in the record about whether Wyoming is, in fact, obligated to manage for just targeting 110 or manage above 110. And my first question to you is, in your view, does Wyoming have a duty to manage above 110? As I explained in our second brief, it's kind of a tricky question because they are and they aren't, and I'll explain. The actual obligation is to maintain at least, not greater than, at least 10 breeding pairs and 100 wolves. However, as a matter of practical reality, there is no way to make sure that you can meet that standard, that you will have at least 10 and 100, unless you aim higher because things can happen. There is illegal take. There is natural mortality. Things can happen. And so if you want to be sure of having at least 10 and 100, you have to aim higher. How much higher? Well, the record shows that for the first year, Wyoming's plan was to have 15 breeding pairs and 170 wolves just within its portion plus Yellowstone. That's what Wyoming was aiming for? That's what Wyoming was aiming for. That's in the rule. And that is on page Joint Appendix 111. That's what they were going to do in 2012. The record obviously doesn't show what they were going to do after that. What mechanisms are available to them to execute that management strategy? How do they have authority to do that? Well, they can set a hunting season, and they can restrict that or end that if that is bringing the numbers down too low. They have authority to issue legal take permits for wolves in an area where chronic wolf depredation is occurring, but they also have not only the authority but the statutory duty to cancel those permits, cancel existing permits and stop issuing them, if it could cause them to not make their population management objective of 10 in 100. If it could cause them to not make their management objective, that makes a much smaller buffer, doesn't it? You have to be in a situation where you, the state, think, if we issue these permits, which we are obligated by our state law to issue where people are harassed or threatened by wolves, their property, their livestock. We have an obligation to issue them unless this authority to stop doing so is triggered. That authority to stop doing so, as I understand it, is triggered only where the next permit issued could put Wyoming below not 170, 50, but 110. Am I wrong? I think so. And Wyoming thinks so too, according to what they said. I don't know. I already said that. Well, they say they don't have a legal obligation to maintain a buffer. That's different than saying they won't do it. They have said they will do it. The question is, if they said voluntarily they will do it, you know, as I understand it, the way this was briefed is a little bit of a red herring. The question is not, well, maybe one question is whether they have a legal obligation to manage a buffer. If they don't have a legal obligation to manage a buffer, then where do they have the duty, which is what kicks off their power to restrict? Because they have the duty to absolutely make positively sure that they're going to have 10 and 100. And if in their judgment, as it apparently was the first year, that requires aiming for 170 wolves and 15 breeding pairs, then they have the discretion under the statutory language of the Wyoming statutes to say if this might bring us down below the buffer we have decided to manage for, then that would cut into our buffer and that could cause us to go below our minimum if enough bad things happen that they have to make allowances for. I don't think they can say if this might bring us below the buffer we've decided to manage for. If by that you mean anything other than 110. No, the buffer they've decided to manage for is higher. For the first year we can call it 5 and 70. If they think they can do that in order to be able to maintain an absolute commitment to 10 and 100, then, yes, they have the discretion and they have interpreted their laws this way and Fish and Wildlife Service reasonably interpreted them this way as well. They have the discretion to stop issuing permits if it's going to eat away the buffer because then you have no safety margin left. Where in Wyoming law is that? I can ask one of you if you don't have that. It would take me a while to find it for you. I'm sure Mr. Jordy could answer that much more effectively. It's set out in one general sense in the addendum, and it's very general, and that's the criticism of it, but at least the Fish and Wildlife Service, or JA 87, was satisfied, given the staffing that the state has, that this flexible management plan was adequate, that unlike Montana and Idaho where Fish and Wildlife Service required a 50% because of Yellowstone and the Indian Reservation, they pointed out Wyoming had no ability to control what goes on there so that its plan had to be very different. And I was a little surprised given what the documents at JA, both the plan and the addendum say, that the state submitted to the Fish and Wildlife Service on which it relies for Wyoming to tell us it had no obligation to maintain a buffer above the 100. Well, the question in the delisting case here is the Fish and Wildlife Service made a factual finding that Wyoming could and would meet its obligation which was to maintain 10 and 100. I understand that, and that's my reference to JA 87. All I'm saying is Wyoming's brief is telling us something a little different, and that leads me to some concern about a pharmacist commitment when the legal representative of the state presumably will advise the officials of the state in accordance with the representations made in its brief to this court. Well, I think Wyoming has only said that it's not a legal requirement. That doesn't mean it isn't a necessary practical requirement to carry out what is a legal requirement, which is maintaining 10 and 100. You don't read Wyoming's brief to be pretty clear on this point? I think they have said that the Fish and Wildlife Service did not demand a buffer, but they also said that they will manage a buffer because it's the only way to accomplish what they do have to accomplish. I'm not sure that helps you because I hear you saying it's my question, everybody. So when the Fish and Wildlife Service said we were decided against requiring Wyoming to provide a specific numeric buffer, but, quote, while Wyoming will and must maintain a buffer to consistently meet its minimum management target, quote, unquote, that's all on JA 87, for Wyoming's brief to say they don't have any legal obligation. Well, I think exactly what that says. They must to meet their minimum management target. It's not they must because we say so. It's they must because that's what it takes to get the job done that they've committed to. I read the service as making it very clear there is a requirement to have a buffer. You don't read it that way? No, the service is very clear that they made a factual finding that there will be a buffer. The requirement is to have 10 in 100, and the service made a factual finding that they will do that, and one of the factual findings supporting that finding is we believe they will manage for a buffer, and the evidence supporting that finding is. No, no, no, just let me be clear. You don't think that the agency is requiring the state to maintain a buffer? As I said to Judge Pillard, it's complicated because. It's not complicated when you look at what the agency said it was doing, it seems to me. Now, if the agency wants to take a different position and say what it said here is not exactly what it meant, that's fine, and you can tell me that. No. But it says we're not going to impose the way we did for Idaho and Montana, 50%. But we're going to have this management flexibility. Right, they will have the management flexibility, and it does not have to be numeric, which is what you're referring to there. What they said on page 87 and then they said it again on page 98 is that they must maintain 10 in 100, and in order to do that, they will have to, but this is a practical have to, not a legal have to, manage for a buffer. If you look on page 98 of the joint appendix, they said, we conclude that Wyoming will maintain a buffer. Both the statute and the regulation require maintaining, quote, at least these minimum population levels, and, two, meeting the statutory and regulatory mandate will require managing above this goal so that uncontrollable sources of mortality. So if Wyoming were to report or the agency were to determine that, in fact, Wyoming is maintaining the minimum, that would suffice to meet its legal obligation. Just hypothetically, a ridiculous hypothetical, Wyoming decides there will be no hunting in the state, there will be no lethal takes, there will be, you know, all these permits are repealed or, you know, et cetera. And so this will just be a quiet zone for wolves. Well, I think that would cause the population to say hi. But if they were to change their mind, write their word, and if our finding was incorrect, then that's what the post delisting monitoring plan is for. And if Wyoming changes management direction in a way that impacts the wolves, then that triggers a status review automatically. However, the service reasonably found evidence that they would keep their word and manage for a buffer. The evidence for that was, first of all, the plan and the addendum in which they very clearly stated that they would. Secondly, on page 98, again, of the joint appendix, they analyzed Wyoming's incentives and the other states' incentives, too. All of the states have managed above the minimum that they must in order to ensure that they can and because they want to maintain management flexibility so that they can control animals that are having conflicts with livestock. They'd have to cancel those permits if it got too close to the edge. So they don't want to get close to the edge. That's been the experience with Montana and Idaho. It was planned for in Wyoming, and it's reasonable to conclude that these states want to preserve their management flexibility and want to prevent the risk of relisting, which would happen if they did not meet their legal obligations. And then, finally, there is the common sense that I just read you, that there's no way to be sure that you're going to have 10 in the 100 unless you aim above it because something can always happen that you can't control. So that's the evidence supporting the finding. When Wyoming argues in its brief today that having a management buffer for the state's minimum management target was not a condition for delisting, do you agree with that? It was a practical but not legal requirement. I'm sorry I can't give you a more concrete answer. I'm trying to figure out what I'm supposed to do. They're supposed to manage for a buffer. They said they would, they've committed to, and there's no other way for them to do what they're legally obligated to do. And so when the agency says, look, we told Idaho and Montana that they had to maintain buffers of 50%, but because of why Yellowstone and the Indian Reservation were not going to do that with Wyoming. So there's no legal obligation. I just need to be clear. This buffer is akin to, in Wyoming and Idaho, in order to make sure they keep 15 and 150, they have to aim above that, too. And they have said well about it. Let me understand my point of view that if I'm an agency official in Wyoming trying to figure out what I need to do, how many permits I can issue, during what seasons and all, if I don't have any obligation to maintain a buffer, I'm going to make one kind of decision. Whereas if I have an obligation to maintain a buffer, that's another kind of decision. I just want a little clarity here. The obligation to maintain a buffer is found in the management plan, which governs Wyoming's actions. They follow their own management plan. It's found in the addendum, which explains how they will do things. And it follows from their obligation. I understand that. In the 2070 listing rule, the one that was later enjoined, it was an express condition of Fish and Wildlife Service's approval that Wyoming's wolf management plan be legally authorized by Wyoming statutes. Did Fish and Wildlife Service ever explain why that was dropped this time around? Actually, there were a lot of legal changes between 2007 and the present. For one thing, Wyoming's regulations – The question was is there somewhere in the record that I could look to where there's an explanation of why that was dropped. And I understand there were lots of changes, and you can explain this to me if you'd like. But my question is, is there an explanation? Since so much of it did become regulation, I don't think it was discussed. It was a non-issue for the 2011. Become state regulation? I'm sorry? Yes. Many of the things that were not adequately regulated in 2007, and I'm not sure exactly what one you're referring to, but they became regulated in the interim. Wyoming and Fish and Wildlife Service worked together and negotiated a whole package of measures, some of which were then enacted into law and codified into regulation. Can you give me a sense of what Fish and Wildlife thinks is an adequate buffer? I mean, just a sense. Is it two wolves, or is it 20 wolves? I'm sorry, I don't. I don't have that information. I know that they were obviously satisfied, because they went ahead with the listing, with Wyoming's plan to manage for 170 wolves and 15 breeding pairs. And that's not something that the state and Fish and Wildlife have discussed in your awareness? No, I don't actually know of any information on that. It wouldn't necessarily be something like the 5 in 50 you see in the other states, because in Wyoming, that sale-safe margin is provided by Yellowstone. No, I understand that. Okay. Thank you. Do you have a sense, and this is a question for Wyoming, how much of the wolf take each year is from hunting permits, and how much is from potential property actions? Well, obviously, the hunting only takes place when the state has management control. I believe they set a quota of 52 for that first year that they were going to have management. But, you know, wolf populations, there's been hunting seasons in Montana and Idaho every year since delisting in 2011, and Idaho's population has gotten bigger. The wolves are very prolific breeders, and so even when they're being controlled by hunting and by lethal take permits and by control actions, that doesn't mean they can't withstand that mortality. It might make them grow slower or not grow, but it doesn't necessarily bring the population down. You also asked the number of control actions. I believe during the years of this rule, it was around 40, around 40 a year, both under state and federal management. 140? No, 40. So just, you can hunt, do anything in the non-trophy areas. Hunt, kill, I mean, wolves are- Yeah, they're just not regulated in the credit area. In the trophy areas is where you need a permit to hunt, and in, you can't hunt in the park? You can't hunt in the park. So when we're talking about hunting permits, we're just talking about in the trophy areas. The trophy game area, and the state has the ability to close the season anytime they see fit to restrict where, it's not like they have to say everywhere in the trophy game season you can hunt. They can say, this is a dispersal corridor, we're going to protect it here. Right, a lot of people are going to hunt in that discretionary area. Right, they have a lot of regulatory authority in that area. Property permits, also we're talking about, protection of property regulation, we're talking about also the trophy area, right? Yes, because you don't need that authority in the predator area. But, you know, the predator area, the surface we found is not a significant portion of the species range, because it's bad habitat, they don't live there. Alright, so, unless the court has any further questions, I'll ask that you reverse the district court. Thank you. So, counsel for the state of Wyoming? Good morning. Good morning. May it please the court, Jay Gjerde for the state of Wyoming. Recognizing there have been several questions about the buffer, I'd like to start with a hypothetical that I think will state the state's position on this. If wolves were to be delisted in Wyoming today, there would be a five-year minimum post-delisting monitoring period. If, during each of those post-delisting monitoring years where the ESA still applies, the state did not successfully manage for the buffer that it's provided for in its management plan and its rule, yet still managed for 10 breeding pair and 100 wolves, right on the number, each of the five years, there would be no basis for the Fish and Wildlife Service to invoke any type of remedial action, because the state will have fulfilled its legal obligations for maintaining its share of the recovered wolf population. I think it's really significant when you look at what was required for delisting or what was a condition for delisting, to look at the discussions that went on between the service and the state leading up to the 2012 delisting. We have a letter in the record where the service initially proposed this different allocation of wolf responsibility, getting away from the 15 breeding pair and 150 wolves statewide, and going to the 5 and 50 in Yellowstone, 10 and 100 in Wyoming, but also, you know, very explicitly laying out what the service thought needed to be done so that there could be delisting of wolves in Wyoming. He followed that letter up with the letter from Governor Meade that has the points of agreement, and the points of agreement very clearly spell out what Wyoming was committed to doing and was required by the service to do in order to achieve delisting of the wolves. Nowhere in the federal government's proposal and nowhere in the points of agreement after we had several discussions to come to those points of agreement, does it specifically say that we have to have a management buffer for the state's share of at least 10 breeding pair and at least 100 wolves, as was mentioned during the first part of the argument today. The management buffer is a tool or a technique to achieve an objective, and the objective is we don't want to drop below 10 breeding pair or 100 wolves. And so it is an entirely accurate statement to say it wasn't legally required to achieve delisting, but it is a practical requirement because if the state of Wyoming does not manage for the buffer, it can't be assured that it can fulfill its own statutory obligation. What is the practical buffer that you're managing for? Right now it's a narrative buffer that's, to use a phrase that sometimes gets people curious. It's based on adaptive management. Each year the department will assess what has gone on the previous year, look at what the wolf population numbers are in Wyoming outside of Yellowstone. And for clarity purposes, I'll say Yellowstone a lot, not mention the Winter Indian Reservation, but those two are combined. But they'll look at the numbers outside of Yellowstone, they'll look at the different ways wolves were taken in the prior year, and they'll assess the entire situation, and they will determine what the buffer will be for the year going forward. My guess is that they'll do that primarily in the context of setting the hunting regulation for wolves. And so it's an annual process? It is. And do you have any figures that are different from what Fish and Wildlife has said about the roughly proportion, slightly more than half the take recently has been from hunting and a little bit less than half the take has been from property protection? I don't have different numbers, although I think it's important to distinguish when you're talking about non-hunting take. You have administrative take, which would be the department doing it, but you do have the legal take permits. You have take in defense of private property under one statute, 23.3.115. You know, it's my understanding that during the two years that wolves were most recently delisted that there was very limited lethal take permit take. I don't think there was any defensive property take, at least not that I can recall. And so primarily, the majority of the take that occurred was through hunting. It was around 50 wolves were allowed to be hunted, or that was the quota for the first year. The second year was half that. It was around 25. What is the authority for the state to control wolf take when it is concerned that it might be approaching the informal practical buffer that the state uses? Well, with hunting, they simply suspend hunting or don't have a hunting season. With the lethal take permits, you have to look to the lethal take provisions in 23.1.304 and the corresponding regulation. It doesn't, neither the statute nor the regulation specifically mention the buffer. They mention the population objectives of at least 10 reoccurring at least 100 wolves. So let me just try to be really clear about my concern, and then you can help me allay it. The state says it's informally managing above, well above, the 10.100 threshold. The state statute requires permits to be given in cases at least of potential risk to property harassing and threatening of livestock and domestic animals. It requires that they be given under the circumstances stated. The state, I believe you cited general authority within that section that the state has where it has a duty to act otherwise it may suspend. And my question is if you don't have a legal duty at any place above 110, how does that authority to trump your own required permit authority come into play? And I guess that's both a legal question and a practical question. Let's say during the year, before that end of your inventory, things are getting low. More people hunting, maybe there's some illegal hunting. There's a lot of, you know, there's this scenario in the briefs about baiting. Maybe some people do decide to do baiting. The bulls are getting into a position where you want to stop even permitting for people who are claiming that their livestock is harmed. Do you have authority to do that? And if so, where do you get it? Again, looking at the different types of take, I think it's very clear they can suspend hunting whenever they want to. What? They can suspend hunting? Correct. That's very helpful. Sure. And so then you go to lethal take permits. Now, I will concede that the way that the sub-provision on lethal take permits was written in the statute is not the model of clarity. There were discussions about what that language needed to look like in order for the service to be comfortable, that we had the authority to suspend lethal take permits and, in effect, mitigate the shall that you're referring to when you say that you believe there's a mandatory duty. But that language... Do you have authority? Oh, if you look at... I'm just having trouble finding it. I read it yesterday, and I'm just trying to find it. Sure. Your Honor, if you look at Wyoming Statute 23.1.304, and you go back to subsections... Which brief, which appendix, which... I believe that that is in the appendix to the state's reply brief. Because I don't speak particularly well these days, I had to put a non-brief version so I could read it more. It should be to our opening. Well, what I'm seeing in our principle brief right now, it's actually the 2012 session law for the changes to 23.1.304. But if you look at A21 to the final principle brief... And the session law is actually, I think, the better document to look at in terms of seeing what we actually did in 2012. Prior to 2012, it did talk about shall promulgate rules and regulations that allowed for the issuing of lethal tape permits. And it said shall be issued as long as... And then it talked about some specifics. And actually what it was is the old management number. So what was agreed to between the service and state was that language would be added that says the removals authorized by lethal tape permits shall be issued as long as the removals authorized by those permits could not reduce the number of gray wolves below 10 breeding pairs or a total of 100 wolves within the state and outside of Yellowstone National Park and the Muddy River Indian Reservation. So when you look at the phrase could not reduce the numbers, the idea was that the could not reduce was open-ended enough that it gave the department the authority in regulation to... Well, they were required to adopt the regs. So in the regs, they could put language in that allowed them to stop the issuance of lethal tape permits if it looked like the numbers could drop below 10 and 100. It doesn't specifically mention the buffer, but the buffer would be a part of that consideration because the buffer would be a place to assure that we don't get to 10 and 100. And so if we had a situation... That I don't see. That I don't see. I mean, here your buffer is the could. It is the scope of the could and nothing more because that's the only authority that you have to cancel. Well, I would say the buffer is at least 10, at least 100 in the actual management objectives and the at least on both of those numbers was included to give the flexibility to the department. Here, it's the saturating of the could not reduce below. Everything's in play and it's at the discretion of the department to determine whether or not there's a real danger of the numbers dropping below 10 and 100. You can't tell me today what you operate for if there's a Wyoming department sense of, okay, when we see it coming in at 120 and 12, we say that's a dangerous number and that could drop below. You don't have any benchmark like that. A specific numeric benchmark? Yeah, informal benchmark first. No, that would be at the discretion of the department in the moment to determine. But this is consistent with wildlife management. Wildlife management is not an exact science as you mentioned with the number of scenarios and hypothetical. There could be a lot going on out there in terms of anticipated and unanticipated take of wolves. And so, what the statute and the corresponding regulation on legal take permits gives the we think because of X, Y, or Z, depending upon what's going on out there, we need to stop issuing legal take permits. Now, a significant consideration in that may well be... That's actually really helpful. So, tell me the tools you have. You're managing good faith above 100 and 10. You understand it's not a legal obligation that's going to cause you to be illicit, but you want to do it. And you can stop hunting permits. You can limit the number of hunting permits. You can, if there's a potential, if it could fall below 10, 110, you can stop these kind of permits. What else? What are the tools? Well, in terms of 223115, which is defense and take of private property, as I've argued in our response reply brief, the Game and Fish Commission has the authority to shut back take off, although that is not expected. Even the unpermitted take? Correct. Where's the authority for that? The authority for that comes from 231302 Romanet 29. There was language added to 231302 Romanet 29 in 2007, directly in response to some concerns. You asked the question about the plan or the scheme must be legally authorized. We're referencing the 2007 listing. I believe this language was put in perhaps in direct response to that. It basically said that the commission has the authority to do whatever it needs to do to fulfill its duties under the Game and Fish Act with respect to gray wolf management. You had a residual, a general statutory authority somewhere that you cited. What is that? General statutory authority. I believe that's 231302 Romanet 29. That's the powers provision of the commission. What we did by adding that language to the commission's powers is, in effect, give them this overriding authority to make sure that they could take whatever step they need to take to manage for at least 10 and at least 100. Again, this all goes back to the long history of the back and forth between the service and this was something that the service was insistent upon at the time it was put in and Wyoming put it in. At the time it was put in, obviously, it wasn't specifically directed at at least 10 and at least 100. It was directed at the management goals at the time, which were lower. The difficulty that I have is that the commission has power to control, take measures that are necessary to carry out the commission's duties. That's the difficulty. You don't have a duty to manage a bug, but you just think it's good practice. I'm not sure that power is as useful to you as you are suggesting it might be in terms of actually being able, assuming that you are willing and eager, to manage a bug in the way that you're... The commission has a duty not to go below. Right. The only practical way to accomplish that is to manage a bug. Okay. I see the red light's been on for a while. If there are no further questions, I will... Can you answer my question about this Von Holtz study? If the Von Holtz study only references Yellowstone, what I can tell you, Your Honor, is it's been Wyoming's understanding all along with genetic connectivity that all of the wolves living within Wyoming, including Yellowstone National Park, because the vast majority of Yellowstone National Park is in Wyoming and you can identify which part of Yellowstone is in Wyoming, for genetic connectivity purposes, any evidence of genetic connectivity that arises in Yellowstone Park counts towards the state's goal of achieving genetic connectivity. I would also point out that the state has committed to genetic connectivity and its dispersal of wolves, primarily from Iaho into Wyoming, but the door swings both ways. Okay. Thank you. Thank you, Your Honor. All right. Counsel for Appalese? May it please the court, Timothy Presso for the Appalese. I'd like to turn directly to the issue of the buffer. The government said that the question whether the buffer is a requirement is a tricky question, but it's not. The service said in the delisting rule that Wyoming must manage for a buffer above its minimum commitment to 10 and 100, and the reason for that is that Wyoming has a uniquely hostile management framework for wolves. No other state designated wolves as predatory animals subject to unregulated killing by any means year-round throughout 83.5% of the state's territory except Wyoming. Wyoming also has the other lethal take authorizations that the court has already discussed this morning. The consequence of those take authorizations is that the Wyoming wolf population under state jurisdiction is effectively like a fib, constantly losing individuals to unregulated take or take through various other authorizations. In order to achieve 10, 100, therefore, you have to have more than 10, 100. Now, there's been a lot of discussion this morning about how many more, and I think that underscores a key problem here. Wyoming hasn't told us. The service didn't specify, and so the question is, what is this buffer going to be? Is it a buffer that Wyoming deems adequate? Is it a buffer the service deems adequate? Is it a buffer that the best available science and the peer review would have deemed adequate? There is no answer, and at this moment, they have not told you, and they cannot tell you the answer to that question. When we have something so critical, such a centerpiece of the state's regulatory framework that's left utterly undetailed, the agency had no rational basis to find that there was an adequate regulatory framework to protect wolves after delisting. What about the argument Mr. Dirty made, which I gather really does dovetail with the argument that was just made, which is when they say, when Fish and Wildlife said, Wyoming must manage above in order to meet this target, it wasn't speaking legally, it was speaking practically, and anybody who undertakes to stay above 110 is just necessarily going to be managing above, and that they know that. If you know you have to stop before you hit a brick wall, you know you have to decelerate, and nobody has to regulate the point at which you have to start putting on the brakes. It's not that simple. If the history of the dealings between the Fish and Wildlife Service and Wyoming illustrate anything, it's that they have not seen eye to eye about what is necessary for wolf conservation, and the service has repeatedly had to go back to Wyoming and demand more of them, often prodded, frankly, by litigation from public interest groups to take those steps, and yet now we're in this position where we have this faith-based approach that says, the service says, well, we think Wyoming will do this adequately. For a decade or more, we've had to prod Wyoming at every step down the trail, but we think now they'll sprint ahead on their own. That's not a rational approach, given the history and the record of this case. We do generally think there's some room for comedy between sovereigns and that the federal government cannot and is not in the business of micromanaging everything that the state agency does. With the framework and the undertakings of Wyoming, and the backstop of further scrutiny, the question is, what about this is arbitrary? Well, even acknowledging the potential for comedy between the federal government and the state, the government decides to make a rational determination that there were adequate regulatory mechanisms under 4A1B. Why is it not adequate to say it's undertaken to manage for 110? And they've acknowledged that in order to do that, one has to, in a practical matter, aim higher, and they have tools, and they have authority to do that. I mean, arbitrary approaches, as you know, is in a low bar. It is a low bar, but here, the service relied on the buffer to deal with the generalized threat of human-caused mortality, which the service repeatedly says had to be adequately regulated. Not only did they say it had to be adequately regulated in general, but they said that regulation had to be adequate to compensate for uncontrollable sources of mortality. That is the purpose that the buffer serves in this framework. That's precisely what it does, and that's precisely the thing the service said had to be regulated, and yet the buffer is non-regulatory. But this is not simply about the omission of a regulatory protection that's needed to deal with human-caused mortality. It's also about a counterweight to the hostile regulatory mechanisms in Wyoming's framework that otherwise would not have passed muster under the service's analysis. Well, they've changed a lot of their regulation, and what are you pointing to now that would be under the delisting? Well, they've changed a number of things, but a lot of things haven't changed, Your Honor, and the service repeatedly relied upon the buffer to deal with what would otherwise be a threat from portions of the framework that have not changed. Specifically, with respect to the predator zone, the service said that would have been a serious concern, but it is not a concern because Wyoming is going to manage for a buffer over the minimum population. I'm sorry. It's page 55587 of the Federal Registry Notice. I don't have the Joint Appearance Page right here. With respect to the defense of property killing, they said this framework will not imperil wolves provided Wyoming manages for a sufficient buffer above the minimum population to withstand the source of mortality. That's 55585. They said Wyoming's monitoring framework, the peer review has criticized because it has a threat to mask population declines, but that's okay provided Wyoming manages for a sufficient buffer above the minimum population. That's 55556. Repeatedly, the service turned to the buffer not just to deal with the generalized threat that human-caused mortality is the key issue for the species, but they counted on it as a counterweight to the regulatory, enforceable, mandatory provisions of Wyoming's framework that would otherwise threaten the species. Yet, the only thing that's standing out there to counter these enforceable threats to the wolves is this non-regulatory, unenforceable, voluntary buffer. The agency cannot- That's not quite right. There's the greater Yellowstone area. There is the permanency of the trophy zone. There is the hiking up from the previous undertaking of hiking with 77 to 110. What if Fish and Wildlife had said, buffer, that's on you, other than the Yellowstone area buffer, 110 permanent zone, we'll take it. Would you still be here? Well, just to be clear, the service certainly looked at the points that your honor has enumerated, but notwithstanding all those, they said you have to have 10 and 100. Right. It's not an interchangeable thing. If you have these other things, you don't need 10 and 100. No, no. I'm saying if they said, you have 10 and 100, you have the Yellowstone area, you have permanency of the trophy zone, you have the season-only expedition, if they had not had this whole confusing back and forth about this buffer and whether it's legally obligated or not, whether there's a light on or not, if that had just been not part of the case, and I recognize that it was, but if it had not been part of the case, and they were here today defending the delisting proposal based on that, your position is? That the delisting would have been unlawful because at that point, you don't have the buffer to counteract the predator zone. You don't have the buffer to counteract the defensive property killings. You have the Yellowstone buffer. But the service never took the position that the Yellowstone buffer was in any way a substitute for the 10 and 100, which necessitated more than 10 and 100. So, I mean, that, there was never, the service's position was never that the Yellowstone population meant you didn't have to have more than 10 and 100 within the areas under Wyoming's control. You had to have the Yellowstone population, and then you had to have the 10 and 100 plus a buffer in the areas under Wyoming's control. And the reason for that is, why have we got all these other authorizations that are draining away the population and going to prevent you from achieving 10 and 100 unless you manage for more than that? And yet, the critical promise to manage for more than that is nowhere nailed down in a regulatory commitment. It's left to this voluntary approach. But doesn't it just emanate from the requirement to manage for 110? That's what they're saying. They're saying we have a, the end is clear. Means, that's for us. Well, I mean, the peer review looked at this, and one of the peer reviewers said what Wyoming has committed to could be satisfied by 11 breeding pairs and 101 wolves, which is no meaningful buffer at all. And so, clearly, there's a range of opinions on what's an adequate buffer. Right now, we're in a trust us mode. The Endangered Species Act is not a trust us statute. It calls for the service to consider whether there are adequate regulatory mechanisms. Those regulatory mechanisms, in this case, would have been inadequate but for the buffer. And yet, the buffer is not regulatory. So, the service is counting on this voluntary assurance to make accessible mandatory and forcible aspects of this framework. That's the problem. The other thing I think that's worth noting here, Your Honor, is this court has some familiarity with the service's policy for evaluating conservation efforts as a result of the dune sagebrush lizard case that was recently decided. That policy does not apply to delisting decisions. The government argues it applies by analogy. Even in the context of those kinds of unenforceable efforts that are the subject of that policy, there is, the service has insisted on quantifiable parameters to determine that those kinds of policies would be effective. Quantifiable parameters, not faith-based trust us approach. So, here we are in a situation where the service can't even rely on that policy because it only applies to listing decisions, but the service has gone to a place that that policy wouldn't let it go. It has gone to a place of relying on something that's unquantified, utterly unquantified, and nobody can tell you what it will be. And yet, that's the linchpin of this framework. That's the problem the district court perceives. That's the problem that is at the heart of the regulatory mechanisms analysis in this case. I do want to address, unless the court has other questions on that issue, I do want to address Judge Rogers' bond hold study is the best available science on the question of examination of genetic material to determine the level of genetic exchange into the Yellowstone population. You're absolutely right, it's the Yellowstone population. But the bulk of the Yellowstone population is in Wyoming. And as a matter of fact, the only effective migration, meaning successfully breeding migration that has occurred into the Yellowstone population, has been in Wyoming, south of Yellowstone National Park, originating in central Idaho. Bond hold does not specify itself the level of that effective migration, and you have to turn to another that when you parse out the bond hold study results, what you get is a documentation of .42 effective migrants per generation into the Yellowstone population. Not one, but .42. And so it is correct that bond hold talks about Yellowstone, but it's also the case that the bond hold results, when they're more refined in the subsequent email, show that what we're really talking about is immigration that's happened in Wyoming, and it's come from central Idaho. And it's not, the documented results do not meet the service's minimum requirement for genetic exchange to justify... Well, you heard counsel say, well, look at the Imanez study. I'm sorry? Counsel told me to look at the Imanez study. Yeah, the Imanez study. The Imanez study similarly does not document sufficient genetic exchange. In each of these circumstances, the service is relying on extrapolation to take inadequate documented results and turn them into results that satisfy the service's own delisting standard. There's nothing wrong with extrapolation. All right. So part of your argument, I thought, was, well, even if you double it, you still don't get to one. Exactly. But I'll go back and look at this Imanez study to see if there's anything more there. Your Honor, as the court said, there is nothing wrong per se with extrapolation, but it has to be informed extrapolation. It can't be guesswork. And what we have here is an extrapolation from Imanez from which there is no scientific support cited, and then an extrapolation that defies the advice of one of the Von Holt authors who worked closely with the service on this analysis. Not only that, as Your Honor points out, doubling the Von Holt result doesn't achieve the minimum. That's one problem. But there's a whole other layer of problem here, which is that Dr. Stahler says, I don't think the best available information justifies this kind of doubling approach that you've taken. The service doesn't disclose that and just doubles it in order to, you know, quite conveniently. It more than doubles it, frankly, to quite conveniently arrive at a one-migrant-per-generation documentation. Well, it says maybe more study would be appropriate here. But it's difficult to track these walls for all kinds of different reasons that they spell out. So all we can do is we've got recovery, and so we're looking down the road, and we have all these commitments. Well, first of all, I think the important point is we don't have recovery unless we have one-migrant-per-generation. And the best available science in the form of those two studies doesn't show we have that. But beyond that, it would be one thing if the service had said the best available science doesn't show we have the minimum standard, so more study is appropriate, as your honor suggests. But I don't know what they did. They said the science doesn't show that we have the minimum standard, and they said, so we're going to turn around and delist. That's the problem. Okay. But you have 4-2, you know, which is maybe not quite half of that. And you also have Stahler saying there probably is some underestimation, right? And then you also have the, I think everybody accepts that radio control doesn't tell us the whole story because not all of them, you know, the generation is four years, and if younger wolves are more likely to move, then you've also kind of got to somehow include that in the way that you do this. So what, in your view, then, would be a reliable number? In other words, I mean, does it have to be a study that says, you know, 1.5 per generation, or can we accept something less than that in their considered opinion? Well, the standard is one. So, I mean, if they can document or justify one, they've met their standard. But what do you mean when you say, you know, if they can document one? In other words, it's got to be that they can't consider that it may be underestimating. They can't consider that there are wolves that they can't track because they're not all with radio collars and so forth. So, in your view, they have to be able to show through some methodology that there's at least one. Is that what you're saying? Well, I'm not objecting to the idea of extrapolation as a general matter. What we're objecting to is the idea of extrapolation based on a methodology that the very scientist whose results you're relying on has rejected. And the survey is sort of saying we're going to pick and choose the part of that scientist's work that we like. I'm not sure it's fair to say that he rejected it. He said it underestimates somewhat. I wouldn't say that we could say it's double. Right. And so, as I read what they say here, I think it's at 124 if I remember correctly. They basically say this is the number we've got. Stahl says it's some underestimate. Somebody else says it might be as much as double. We don't know. Yeah, well, what Stahler objects to is doubling. Right. He says I don't think you can justify doubling. And they do put in that he objects to that. Well, what they said is, this is, I'm sorry, Your Honor, I have the Federal Register notice. It's 55593. What they said is while additional analysis may be needed to determine how much of an underestimate this represents, citing Stahler. Right. They don't ever say Stahler objected to doubling and, by the way, we're more than doubling it to get to where we need to go. They never disclose that. But beyond that, Stahler says that the doubling they want to do is not based on supporting data. That's at page 937 of the joint appendix. That's what we object to. They're taking an analysis that the very scientist they're relying on says is not based on supporting data, and they're using that to determine they satisfy a key recovery criteria. So just behind the entire challenge is clearly a lot of history. I'm not sure, you know, how and whether that bears on this decision before us today. You know, and I guess I'd like you to say where in the record have you pointed to some places where Fish and Wildlife in your view thought the buffer was important in a way that you suggest that Fish is required to be quantified. Other support for the, you know, more formalized approach that you advocate? Well, I guess just one small point before I launch into that. Your Honor, you said that we were suggesting the buffer had to be quantified. I don't think we're suggesting the service had an obligation to set a number, but it had to set something other than just this open-ended trust us approach. What would it be other than a number? Well, so for example, one of the things we see in the record is there's discussion of assuring a methodology that would achieve a 95% confidence level that 10 and 100 would be maintained. They could have prescribed something like that. What does that mean to you? I'm not a biologist, and so I can't tell you what it means. I know that in the record, I think it was Dr. Mills said 15 and 150 would achieve that at that time. But clearly there are expert biologists who could apply a framework that says you have to have a 95% confidence based on the best available science, and that could be a reasonable assurance. We don't have that here. We don't know what confidence level will be assigned to the buffer management by Wyoming. What we do know is Wyoming has been comfortable with a lot higher risk than the Fish and Wildlife Service has been comfortable with. Support that. Okay, well, I mean if we look at, for instance, you know, some of this stuff is pretty clear from the record. So, for example, the service's longtime recovery coordinator, Ed Bangs, is quoted as talking about on page 1159 of the joint appendix, never underestimate the strength of the agricultural political pressure in Wyoming to always be to get as close to zero wolves outside the national parks as possible and then dare the service to release. It's not just Mr. Bangs. We see that repeatedly in the agency's comments, and the service formally noted in its delisting rule that Wyoming has consistently pushed to have absolute minimum management targets outside the national parks and to put the burden of most of the wolf population requirements on the parks. And, of course, you have before you in this briefing the amicus brief from what's called the Wyoming Wolf Coalition, which is 24 counties and conservation districts and other governmental units and hunting groups in Wyoming who are urging you to find that the parks are the buffer and there is no requirement to do anything other than 10 and 100 outside the parks, which is clearly not what the service required, but that's the position that they're taking. So it's not like we're making this up. There is a concern, but the court doesn't need to rely on that. All the court needs to rely on is that the service recognize that 10 and 100 is not achievable without more than 10 and 100 and that you need that buffer not only just to meet your minimum requirements, but also to make sure you satisfy those requirements in the face of the hostility in the predator zone, in the face of the defensive property take, the legal take permits, and yet that key linchpin, that central piece, is not assured. Not only is it not assured, but it is unspecified. And there is no answer you can get today that will tell you what will that buffer be going forward because it's never been detailed by the state or by the federal government. Unless there are further questions, I'm going to thank the court for the opportunity and I urge you to affirm the decision below. Thank you. All right. Counsel for appellants. Good morning. First of all, I'd like to keep my promise to get you the map citation for the subpopulations. That's the joint appendix 744. There is also a map of the known dispersion. These are the radio collared ones. That's on joint appendix at 1160. I would like to address this allegation that we've taken a faith-based approach here. That is not true. The question before the court really is, is there adequate evidence in this rule to support a therapist's finding that this population is not endangered or threatened by any of the factors in Section 4A, including the adequacy of regulatory mechanisms? And we have here a commitment to maintain the minimum. The overall requirement for the recovery plan was 10 in the 100 in the state, all inclusive, including every part of the state. They've buffered that. They've added a safety margin by saying Yellowstone doesn't count. That's 100 wolves that don't count. And they have to maintain 10 in the 100 outside that. Then we've got this additional management commitment by the state of Wyoming to make sure they don't breach their share, their 10 in the 100, by they committed to manage above that level. The evidence supporting that finding is the plan, the management plan, the addendum, Wyoming's incentives, which are discussed on page 98 of the joint appendix, and, as we've discussed before, the common sense fact that you can't keep a legal commitment to maintain 10 in the 100 unless you aim higher. The only evidence against that finding that the plaintiffs have pointed out is that they don't trust the state of Wyoming. But there's enough facts to support that the agency has substantial evidence to support its finding, and it was an error to overturn that on the ground that it wasn't contained in a law or a regulation. And this court's decision in Defenders of Wildlife v. Jewell, the other Defenders of Wildlife v. Jewell, the one about the gene sagebrush lizard, supports us on that point. I agree with my opposing counsel that it doesn't close the deal, but, still, it refutes the argument that the service may not rely on anything that is not a binding law or regulation. It refutes the argument that all evidence is divided into two categories, things that are laws and things that are speculative. This court found that the conservation of animals- You say that the agency's interpretation of the reference to regulatory mechanisms is entitled to deference, and I wonder where is the interpretation that we should look to in the record? Two places. It's on page 98. Of the day? 98, they talk about- they use the words regulatory framework, but it's really the words regulatory rather than the word mechanism that's in dispute here. The plaintiffs maintain that it can only include binding laws and regulations and the service- Wyoming maintains that it unambiguously includes regulatory documents, documents produced by regulatory agencies about how they will incorporate and implement the regulations, and we take the middle view that it's ambiguous- No, you say it's absurd. Huh? You say in your brief it'd be absurd. We say that the term is ambiguous, but I'd like to just point out that the argument that the plan is a regulatory mechanism is one completely independent argument of why we think the district court erred. The other argument, which is- Let me just be clear. When Judge Pillard asked you for a record cite of what interpretation of regulatory mechanisms we should defer to, you cited her to a page where you acknowledged the discussion of regulatory framework, which is a much broader concept than what is put in issue by the plaintiffs. So do you have a better cite? Well, perhaps I didn't explain this one enough, but let me just first say on page 98, basically it's responses 39 and 40 in the rule, and so that's Joint Appendix 98 and 100, but the dispute between the parties is does regulatory mean only laws and regulations? No, they're talking about sub-factor D, which I understand, and I know you dispute it, but they look to all these dictionaries that, you know, a regulatory mechanism, that whole concept is incompatible with non-enforceable voluntary commitment. And our position is that the term regulatory is ambiguous. It can mean a lot of regulations, but Pillard didn't say that. And that I will find on- where will I find- Well, you know, the issues have obviously sharpened through briefings to a point that goes beyond what the rule says. With all due respect, this is a statutory requirement. Yes, and it was satisfied. They made findings that- whether or not you count the management plan as a regulatory mechanism. I know you don't want to answer this question, but it's important if the agency has told us how they're interpreting this as distinct from finessing the issue. The explanation, which I guess you'll just have to decide whether it satisfies your statutory explanation, but it is on 98 and 100. Okay. Well, let's see. They explain, first of all, because it's in answer to a question saying you shouldn't count things that aren't binding. Some of them even said you shouldn't count the regulations and the statutes because they could be changed. And so they say our primary consideration are the statutes and the regulations. And then our next consideration are the plan that clarifies how the Wyoming Game and Fish Department intends to satisfy these statutory and regulatory mandates. And then a paragraph down, they explain the requirement under Section 4B of the Endangered Species Act to base their decisions, their findings under 4A, on the best scientific evidence available after taking into account state conservation efforts. And this is all on page 98. So that is one of our two arguments is that whether or not this is a regulatory mechanism, it still has to be considered because the statute explicitly requires that. In fairness, I didn't think that the argument that the plaintiffs were making was that you couldn't consider all these things under Section 4. The only argument is when you get to D, it's not talking about efforts. It's not talking about voluntary commitments. It's talking about what are the legal obligations. And at least that's their interpretation. And I just wanted to know, I understand this framework argument, but whether the agency has said that's just incorrect. And what you're reading now is, before you started talking about 4B, is what you think is the agency's best statement of its interpretation. The other one would be on page 100, the answer to response 40. As noted above, statute, state regulations, and the Wyoming Wealth Management Plan are all important pieces of the state's post-e-listing management framework. All three of these documents guide and clarify the state's approach to wealth management after e-listing, and ignoring any one of these three documents would violate our responsibility to rely upon the best scientific and commercial information available. It doesn't talk about sub-factor D. Well, the sub-factor D is not special. The requirement to base... Congress thought it was. Not more so than A, B, C, and D. No, I know, but I mean, when we were at D, Congress said, what are the regulatory mechanisms? Right. So regardless of whether the plan is a regulatory mechanism, in evaluating the... I don't think that's even argued, counsel. All right? With all due respect. I don't think they're saying you just shut your eyes to everything around you. All they're focusing on is what is the requirement as to D. And even if you assume that the management plan is not itself a regulatory mechanism, it's still relevant to that inquiry, and that is what they have definitely explained on 98 and 100, and that's the argument that we feel is supported by the Dooms-Sagebrush-Lizard case and is very plainly supported by the statutory language. They are required to take into account state conservation efforts. The management plan pretty indisputably is one. I just wanted to briefly touch on the issue of genetic diversity. Even Stahler said that it could be more than double. They found 0.42. If you extrapolate 0.42 from 30% of population... It could be 100 times more. I'm sorry? Stahler's e-mail is pretty clear. He said it could be more than double. The important thing he says is, especially in recent years, the Von Hull study is not the only support for the Fish and Wildlife Service's finding. They also have the Jimenez study, which goes four years later and shows a lot more immigration. And this is all on page 124 of the joint appendix, where they explain wolf by wolf what they base their findings on. It's well supported in the record. It is not speculative. And to the extent that counsel is saying that because it only sampled 20% of the wolves, Stahler was 30%, the radio collared... Oh, sorry, not Stahler. Von Hull was 30%, the Jimenez was 20% to 30%. It varied how many wolves they collared. To the extent they're saying that that's not good enough data and that we should go do another study that collars 100% of the wolves, that's just contrary to the law. I don't think anybody's arguing that. Well, he's saying that you have to absolutely show one generation without extrapolation. Just because you have two children, I can't speculate that you really have six. But it's 20%. And they point out that in the preamble for the rules, these statements are made and there's no citation. In the preamble? It's in the brief. It is. Okay. All right. Thank you, Your Honor. I just want to finally point out that four out of the five peer reviewers did find that both the population and the genetic diversity were going to be satisfied with this rule. Thank you very much. Thank you. All right. Counsel for the state, if you wish to say anything. Thank you, Your Honor. Your Honor, I'd be happy to answer any questions. Otherwise, I won't. All right. Thank you. All right. We'll take the case under advisement.
judges: Rogers, Brown, Pillard